431 F.2d 1025
 The FIRST NATIONAL BANK OF CUSHING, CUSHING, OKLAHOMA, a national banking association, Appellee,
v.
SECURITY MUTUAL CASUALTY COMPANY, Appellant,
v.
Robert W. ADAMS, Robert W. Adams, Executor of the Will of Alma M. Blank, deceased, Frank G. Berry and George M. Berry, Executors of the Will of James E. Berry, deceased, Levi Swingle, Arthur Blaine Imel, E. L. Roberts, D. A. Griffin, and George M. Berry, Appellees.
 No. 94-69.
 United States Court of Appeals, Tenth Circuit.
 August 20, 1970.
 Rehearing Denied November 5, 1970.
 
 James C. Pinkerton, Tulsa, Okl. (Carl Pinkerton and R. H. Wills, Sr., Tulsa, Okl., with him on the brief), for appellant.
 Gerald G. Stamper, of Thornton & Stamper, Tulsa, Okl., for appellee, The First National Bank of Cushing.
 John M. Imel, Tulsa, Okl. (Martin, Logan, Moyers, Martin & Conway, Tulsa, Okl. and James W. Rodgers, Jr., Holdenville, Okl., of counsel, with him on the brief), for appellees, Robert W. Adams and another.
 Before MURRAH, Senior Circuit Judge, SETH and HOLLOWAY, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 This suit was commenced by the plaintiff, a national bank, against the defendant bonding company for recovery on a banker's blanket bond and on an excess fidelity policy issued by the defendant. This action was based upon a loss to the bank resulting from fraudulent and criminal acts by an officer of the bank. The case was tried without a jury, and a judgment was rendered against the bonding company in the amount of $560,814.47. The bonding company has taken this appeal.
 
 
 2
 The bonding company filed a third-party complaint against some of the directors of the bank and also against the officer-director who was involved in the criminal acts and against an additional officer-director. The trial court dismissed the third-party complaint against all the directors except the two officer-directors.
 
 
 3
 The officer of the bank who was responsible for the losses was tried on a criminal charge and was convicted. In this action there is no question as to the criminal nature of his act, nor the amount of losses which resulted. See Swingle v. United States, 389 F.2d 220 (10th Cir.).
 
 
 4
 From the record it appears that Mr. Swingle over a period of several years permitted the payment of overdrafts on a commercial account by withholding insufficient checks written by the customer from the bank records for extended periods of time, and by subsequent issuance of fictitious drafts, granting of fictitious loans, and questionable purchases of equipment. Another officer, also a longtime employee of the bank, had knowledge of the methods used by Swingle to accomplish the payment of the checks and the withholding of them from the bank records. Other losses occurred on another account where the bank's funds were advanced to a sole proprietorship after the death of the proprietor and to a bankrupt corporation owned by the same person through the use of fictitious notes. The fraudulent schemes of Swingle were not disclosed by the examination made by the bank directors nor were they disclosed by examinations made of the bank by the national bank examiners over a period of several years. Swingle had been employed by the bank in various responsible positions for approximately thirty-five years, and at the time of the incidents in question was president of the bank and had the complete trust and confidence of the directors. He was also active in public and church affairs in the community of Cushing, Oklahoma.
 
 
 5
 The principal issue on this appeal is whether or not the directors had notice of the fraudulent acts of Swingle by reason of their examinations of the bank or by reason of the contents of the reports submitted to the board by the national bank examiners. The appellant bonding company asserts they had such notice long before notifying the bonding company and that the bank directors were negligent to an extent that it is relieved from liability on its bond. Also the company urges that the bank should be held to have knowledge of the wrongdoing by reason of the contents of its records.
 
 
 6
 The case thus comes to us basically as a substantial evidence case. The trial court made findings of fact on the three issues referred to above. These findings must, of course, stand unless clearly erroneous. Of equal importance it is for the trial court to draw the inferences from the facts, and again if not clearly erroneous will stand although there be other possible inferences. Butler Paper Co. v. Business Forms, Ltd., 424 F.2d 247 (10th Cir.); National Farmers Union Service Corp. v. United States, 400 F.2d 483 (10th Cir.), and Rosenfield v. Kay Jewelry Stores, Inc., 384 F.2d 98 (10th Cir.). It found that the directors had no knowledge of the wrongdoing by Swingle and were not put on notice thereof by reason of their examinations nor by reason of the reports made by the national bank examiners. The trial court found that the directors were not negligent in the performance of their duties and that they had no knowledge of the wrongdoing by reason of the bank's own records.
 
 
 7
 We conclude from an examination of the record that the findings of the trial court are fully supported by the evidence. The principal differences between the appellant and the appellee in this appeal are resolved by an analysis of just what the directors were notified or advised of by the reports made by the national bank examiners. In a consideration of this issue, which is a factual one, it is necessary to briefly consider how Swingle used the bank's bookkeeping practices to effect the fraud and to conceal it.
 
 
 8
 The record shows that the bank used a deferred posting system whereby checks received by the bank on a particular day were accumulated and held to be posted by the bookkeeping section on the day following. The bank's records revealed only totals of the checks received and deposits made for any particular day. On the second day when the checks went to the bookkeeping department, the checks which were regular in all respects were posted to the individual accounts; however, checks which were postdated, had improper signatures, or were on accounts which had insufficient funds to pay them, or were otherwise irregular, were not posted but were accumulated and returned by the bookkeeping department to an officer of the bank. The bookkeeping department returned these checks for the reason that the employees there had no authority to enter or to post overdrafts or other irregular checks. Instead some disposition of these checks had to be made by an officer of the bank. These checks which were so returned are referred to in this record as "bookkeeper's turnbacks," or "bookkeeper's returns." A check so turned back by the bookkeeping department on a particular account was given for disposition to the officer who ordinarily handled the particular customer's account. This officer would in the ordinary and proper practice see that the check was corrected or would authorize its posting as an overdraft. The item would be entered as an overdraft or as a cash item on the books of the bank.
 
 
 9
 The record indicates that Swingle, as to two particular accounts which he handled, and particularly on the one account in which the largest loss took place, when he would receive an insufficient fund check on the account from the bookkeeping department as a turnback, he would that day or later put the check back through a teller's window and again it would proceed through the deferred posting system and would be again returned several days later to him as a bookkeeper's turnback. This repeated return and redeposit of the checks was referred to as a "cycling." The way in which it was used by Swingle with the result that checks were held by the bank for several days in turn caused the insufficient fund checks to be paid by the bank as they could not then be returned to the bank or person sending them to the Cushing bank for payment. Further by reason of the cycling, the checks were withheld from proper recording in the books and records of the bank.
 
 
 10
 The record also shows that Swingle, when the accumulation of checks in his cycling became large or when some examination was imminent, would forward a fictitious draft for the customer to another bank, make a fictitious loan, or a questionable purchase of equipment from the customer to provide sufficient funds in the account and to remove the checks from the cycle.
 
 
 11
 As indicated above, the repeated examinations of the bank made by the national bank examiners did not disclose the fraud of Swingle because it did not disclose the fact that he was cycling the checks. The examinations did disclose that items returned from the bookkeepers were held from time to time by the officers and this fact was criticized. It is apparent from the record that the temporary holding of items returned from the bookkeepers was a common practice in banks at the time in order that mistakes and errors in regard to the checks could be corrected, but that it was a practice criticized by the examiners as it was not considered proper banking practice.
 
 
 12
 The position of the bonding company appellant in this appeal is that the directors received notice of the fact that the officers were holding the bookkeeper's turnbacks, and this was sufficient to put them on notice of the fraudulent methods being used by Swingle. On the other hand, the appellee argues that the notice to be derived from the reports of the national bank examiners was no more than of a fairly common poor banking practice of temporarily holding the turnbacks. The record shows that in each instance the returns which were criticized were cleared up during the course of the examination or immediately thereafter. Although on one occasion the report showed the checks had been held for several weeks, the reports of the national bank examiners were considered by the directors at their regular meetings, the officers were questioned about the items, and in each instance were told that the particular item had been properly cleared. The directors were entitled to rely upon such explanations.
 
 
 13
 The record thus demonstrates that the directors did not receive any notice of the fraudulent acts of Swingle prior to the ultimate disclosure of the cycling of checks made by Swingle. The reports of the bank examinations did not contain any information which could constitute notice of the dishonest acts. Thus the record shows only that the directors had notice of a practice which was not necessarily in accord with the best banking practices, but which was common and which was in each instance fully explained at the time. The fraud of Swinwas not disclosed until he advised the chairman of the bank that he was cygle was the cycling of the checks which count and which then totaled a substantial sum. The chairman advised the nacling checks drawn on a particular actional bank examiners of this fact and they immediately came to the bank and conducted an examination which disclosed the fraud. The examiners who had conducted examinations prior to this time and who submitted reports testified that they then had no knowledge of the fact that Swingle was cycling checks in a manner to ensure their payment and to thereby defraud the bank, and consequently their comments in their reports to the directors did not refer to this device used by Swingle, but instead referred only to the holding of the bookkeeper's turnbacks which was a not uncommon practice.
 
 
 14
 The appellant also urges that the directors in some manner participated in the wrongdoing or were grossly negligent by reason of the granting of excess loans to certain customers whose accounts were used by Swingle in the manner described above. The record demonstrates that the excess loans were not the fraud or the wrongdoing upon which the action was based, but instead were a device used by Swingle to hide his prior wrongdoing of which the directors were unaware. One excess loan was brought to the attention of the directors, and it was explained as excess by Swingle because it was on the same security used by another customer. This loan was taken out of the bank by the directors' purchase of it, which was itself proper. The directors had no indication that the loan was otherwise improper as Swingle concealed its purpose and origin.
 
 
 15
 The record further demonstrates that the finding of fact by the trial court that the directors were not negligent is also supported by the evidence. The directors' examinations were made regularly and in accordance with good practice, and the fact that these examinations did not disclose the fraud did not constitute negligence under the circumstances as demonstrated by the examiners' failure to find the fraud. See Hughes v. Reed, 46 F.2d 435 (10th Cir.). Also Swingle and the other officers who had knowledge of Swingle's cycling of checks were the only regular employees or officers of the bank who were also directors, and they participated in and directed the examinations in a manner to prevent knowledge by the other directors of the devices used by Swingle.
 
 
 16
 The appellant also asserts that the directors should have had knowledge of the fraud by reason of the records of the bank itself, but there is no merit in this position in view of the nature of the action and the nature of the fraud concerned.
 
 
 17
 We also find the contention of the appellant that the acts of the bank released the bonding company to be without merit. This argument relates to the participation in the bankruptcy of one of the customers whose account is concerned. This participation relates to the attempt by the bank to recover on what security and assets of the customer were available and cannot constitute an act which would in any way release the bonding company.
 
 
 18
 We agree with the district court that the losses occurred, that the policies covered the losses, and that the directors were without prior notice. The judgment of the trial court as entered was proper, including the interest as allowed. Phoenix Ins. Co. v. Diffie, 270 P.2d 634 (Okl.).
 
 
 19
 Affirmed.